My name is Brandon Banegas and I represent Garrusso and the rest of the appellants. This case asked whether a public employer can compel firefighters to surrender their fingerprints, biometric data, without a warrant, without individualized suspicion, and critically here, without demonstrating necessity. Under O'Connor v. Ortega, a government workplace search must be justified at inception. The O'Connor plurality stated clearly a search is justified only if there are reasonable grounds to suspect misconduct or if the search is necessary for non-investigatory work-related purpose. Counsel, let me ask you, start out with some basic questions. Would it be unconstitutional for the fire district to require an applicant to provide a background? Yes, Mr. O'Connor, because at that stage, the applicant is applying for a job and there's a separate agency that reviews and gives information if this person has a criminal background. Okay, what if the fire district implemented a system of security that, much like our cell phone or iPad, had facial recognition technology and those who work there, were authorized to work there, had to look into a camera in order to be recognized for security purposes? Yes, Your Honor, that's a different situation because we contend that the fingerprint itself, even though the judge ruled for us in terms of the Jones test, we contend that these fingerprints are not plain view or visual. But they're leaving them on virtually everything they touch, from the coffee cups to the . . . I mean, isn't it true that their fingerprints are part and parcel of what is left in the workplace? You would have to have someone follow them and establish a chain of custody and pull up, lift those fingerprints and dust the fingerprints. That's not the situation here. They're being compelled to provide what the government can't get on its own. What about a fingerprint to access a computer, to log on to a computer with the fire district be within its rights to go ahead and acquire that? I don't believe so, no, Your Honor. I would think that they would have to demonstrate a special need and that's the big part of this case that I think needs to be developed at the district court level. What is the special need? We have timekeeping procedures. There's never been any allegations of fraud against these firemen that they would have to give up their fingerprints. Just to come back to your question, I think that some of these cases like TLO, I think it's National Treasury, there's discussion by the Supreme Court and there's . . . I would submit wrangling. How much is a special need in these cases? Much of those opinions discuss how much is a special need. For instance, in National Treasury, that was a situation where they wanted drug test for customs officers because customs officers are dealing with, at that time and still, probably even worse now, the drug trade. The concern was what if somebody is on drugs, is compromised, and is within the customs department or is susceptible to being pressured by this illicit drug trade. Skinner was a situation where they wanted to do some blood testing. I think it was only after accidents actually, blood testing and drug testing after accidents. The court made clear this was a national epidemic. There was discussions. In fact, Justice Scalia disagreed on principle with National Treasury because he looked at Skinner and said, well, at least in Skinner, we had evidence that there was a problem here. This policy was not an investigation into any particular person or any particular department even, correct? Yes, and that's why I wanted to highlight the O'Connor. Was its intention to apply to all parish employees, not just firefighters? Well, within the record, we make the allegation that certain parish employees have excluded themselves from this. The fire chief is excluded? That's what we believe, yes. That's the allegation. Pronos require a fingerprint or not? When I read your materials, it looks like they don't actually require a fingerprint, but when I read the other materials, it looks like they do. We don't believe our allegation. We don't believe it does. In fact, we have a picture, which I think we didn't submit with this, but there's a picture that says, use key cards as a key card for certain employees. There is alternative means. Within the system that they purchased? I believe so. I believe so. I very much believe so, but having said that, one of the things that I think that Judge Vitter got a little bit hung up on was the idea that . . . we're saying that, look, there are less intrusive means. You can use a key card. We believe that the ability to use the key card goes to the heart of the O'Connor test. Are they required to use the least intrusive means? As long as it's reasonable, it would be appropriate, wouldn't it? But you're ignoring the O'Connor test because in O'Connor, it has to be justified at inception, and justified at inception for non-investigatory context, which we can talk about whether this will eventually will be in investigatory context, but having said that, it says that it has to be necessary . . . let me read you the statement, if you don't mind. The O'Connor plurality stated clearly, or if the search is necessary for a non-investigatory work-related purpose. It's not necessary to keep time with your fingerprint. They've been doing work logs for a hundred years. The firefighters have a tradition which, you know, where they keep multiple ways to keep time. So this is not . . . I just . . . the biggest thing for me is that, you know, here we have a situation where they're saying, you know what, we don't want . . . you're making an intrusion on our body, we don't want to give it to you, and the answer is operational realities. No, it's something more than that. It has to be a necessity, and I think O'Connor v. Ortega made that clear. Is the fingerprint an intrusion on the body? Yes, it is, because it's not visible, to answer your question. If a face scan, arguably, if they can catch your face, then the game is over with, okay? But that's a plain view. This is not plain view. In order for them to get this fingerprint, you have to be . . . you have to physically touch and have them capture the images, make them, you know, catch the ridges and all the things that go into that. And so, it is an intrusion. The idea that I could go to the grocery store, and a policeman could say, hey, give me your . . . let me have your fingerprints. Well, it's not for investigatory purposes. I have a right to refuse. There's something that seems kind of crummy about that, and that's . . . that's what I feel. That's one of the main issues with this fingerprint. One of the other statements in TLO that I found interesting was that there was a statement that, essentially, in cases like Skinner Railway, Labor and National Treasuries Employees Union v. Vaughn Rabb, the Supreme Court upheld certain searches only because of profound safety concerns, but I believe within that . . . I'm at the wrong place, but I believe within that case, it noted that it would be anomalous if people enjoyed more constitutional protection when suspected of a crime than in an administrative setting. And that, to me, is the heart of this. We're going to lose our rights. I mean, essentially, with the judges, with respect to the district court, and she did a good job, but with respect to this minimally intrusive analysis, this is something that you can't get in a criminal context. Well, in this context, just because I work for you, you can get my fingerprints. What if it were to enter some part of the fire station where they kept some kind of chemicals that were explosive or something? I personally worked in a job where you had to do your fingerprint and do a code before to get into certain parts of the job. Would that be okay? My argument, in all honesty, is not it's never okay. It's just that we haven't demonstrated any special need. The timekeeping does not overcome the Constitution. If there was something that required only certain people that have a rank, and there's some sort of chemical that stops hazardous waste when there's an accident, and only certain . . . but at the same time, that same chemicals can be used to make methamphetamine, then at least demonstrate what that special need is, and demonstrate that it is a danger. We haven't gotten to that point right now. That's my whole point. I'm willing to concede that in the workplace context, there might be a special need, but right now, timekeeping is not so special, especially when you have all of these alternatives to keep time, and there's no allegations of fraud. Now, if there are such allegations, just like in the Skinner case, in the railway case, they had all kind of statistics about railway accidents and so forth, and drugs contributing to that. If there's something they can develop . . . if the parish can develop a record, then let's do the record, but we have a right to defend ourselves in that regard. Let me ask you too about . . . and maybe your clients are already subject to such a requirement, but let's say every ninety days of your analysis, a drug test, would that be something that would be along the same lines as this, or would you make a distinction? Since they're first responders and they're in positions of public trust, obviously, the public needs to be able to depend on people like your clients to be of clear mind and ability. Yes, Your Honor. We are subject to SAMHSA, and one of the things that I have not done is, when did SAMHSA allow . . . basically, we're allowed to . . . they're allowed, at this point, to do random drug testing, and so because we're covered under SAMHSA, there must be some case that I don't know about that basically says the randomness of it and the fact that you're in the first responder and safety, just like in the Skinner case, then we are subject to drug testing. It seems like a more intrusive search than what we're talking about here. I struggle with that because, you know, one of the things . . . I had a case in Michigan, not the one that I cited, but there was a case where they wanted to get blood to do a wellness test, and essentially, the firefighters fought it, and the court agreed with them and said, no, you don't have to take your blood to do a wellness test. That's not enough of a special need. With the technology, some of the guys will tell me, well, wait a minute, I'm using this fingerprint for my phone. Now, contrary to what the court gleaned, to them, that's their passcode. That's their privacy there, and so to me, fingerprinting and the history of fingerprinting, maybe it's just the difference of opinion, but I just think that's even more intrusive than, say, checking my urine to make sure that I'm not carrying methamphetamines and things. Are they keeping the fingerprints in some sort of database that they have to in order to compare it? So, what I would hope is that you would remand it for development, whether or not there's a special need, but I think part of that would be part of the evidence as to what kind of database. We have no record. We just have what we're being told, and they're watching. When someone quits working there, do they remove it right away? I mean, what's the policy on that? I can only say that Mr. Watson has said that it takes your fingerprint and makes it into numbers and things like that, and that nobody else is going to get it, but we haven't gotten to that point where that would be part of the analysis of whatever, maybe intrusiveness, I guess. So, we haven't gotten to that point. Your argument, you said to some people will have real intuitive force, but there's just not a lot of case law. There's not. There's not, and everybody struggles with this. I mean, even some of the Supreme Court cases, you know, Hayes v. Florida, I think it is, where they always try to back off this issue, and they try to say, hey, he was lawfully seized. You know, Marilyn v. King is a DNA case where someone was lawfully seized. There's no predicate, and that was the thing that we're trying to establish, or at least our side. We want to have a predicate of knowledge of why it's a special need to take our fingerprint that would overcome reasonable suspicion or warrant requirement, and so forth. Oh, just the other point is Kelo. You know, I know I went off in my brief on the idea that this is a enumerated category here, and it just seems to me that when you have a case like Kelo, where Justice Scalia says something . . . you know, we have to draw some lines, and this is a very bright line, a threshold at a house. I think to sit there and demote the body from where the house is in Kelo, I think . . . I would hope that . . . I'm asking that y'all would maybe look at this idea that these two things are . . . they're both enumerated in the Constitution, persons, houses, and effects. In effects, the case, I think it was Kwan case. I don't know if I cited the Kwan case. Even in the Kwan case, where they followed somebody around because he owned the car, you know, and they said, well, wait a minute, that might be . . . that's a constitutional violation. Let me ask you, you began your remarks by noting that this is a public employer. I take it that you would make a distinction between a private employer requiring provision of fingerprints as opposed to a public employer. Is that correct? That is correct, absolutely. Okay, and then also, I guess somewhat related, does it matter that a person is not compelled, none of your clients are compelled or contractually bound to be members of the district? Rather, they could find employment elsewhere. In asking that, I'm not trying to sound crass or insensitive to what your client's concerns are. I'm asking as a legal principle, does that matter? Can I respond? I've got a red light here. Yeah, I mean, basically, there is some case law out there that says your choice between your constitutional rights and public employment, you can't make people choose between your constitutional rights and public employment. Okay. Thank you. Thank you. We have your argument and you saved time for rebuttal. Thank you, Your Honor. Good morning and may it please the Court. My name is Craig Watson. I'm here today on behalf of the Parish of Jefferson, Jefferson Parish Council and the East Bank Consolidated, who are the appellees in this matter. I enjoyed the colloquy with the judges with respect to some of the questions and I want to get back to some of those. I think Judge Enkelhardt sort of hit one of the nails on the head with respect to where are we going in the law? How is the law developing with respect to these ubiquitous functions such as fingerprints? I think if you look at what the test is and Chief Judge Elrod mentioned this and she says, is it an intrusion? Well, we know in the Jones test it added, actually it went back and looked at some of the prior property deprivation type cases to come up with analysis as to whether there's an intrusion or not. And I would submit to the Court that even under the trespass theory of Jones, one can articulate if you look at what the Supreme Court has said about fingerprints, what guidance can they give us to make a determination as to whether there truly is the type of intrusion that the Fourth Amendment is supposed to protect. So we can look at what the Supreme Court in the Davis v. Mississippi case where the judges specifically said that fingerprints do not involve the probing into the private life and into the thoughts that make an interrogation or a search. So the dicta in that case supports the idea that the Supreme Court believes that this is a minimal at best intrusion. If you look at the Williams v. Barry case, which is the southern district case out of Mississippi that's been cited in our brief as well as the judge, it's the most analogous case factually to this, where the state of Mississippi who provided tuition assistance to those families in need operated an E program where they required, instead of signing in and signing out your child, they required you to put your fingerprints. Well, the plaintiffs in that case did the exact same thing and said, no, wait, it's an intrusion. The Court went through the lion's share of the jurisprudence to find that it doesn't involve a search. Because you can look at where the courts have found whether fingerprints or not. I would liken this case to what the Supreme Court did in the U.S. v. DiCineo case where they said, well, wait a minute, the grand jury wanted to subpoena voice exemplars. Is that a search? Is the tone, the affliction of your voice which you put out into the public, is that the type of search that we're going to protect under the Fourth Amendment? And the U.S. Supreme Court said, no, it is not. And in that case, they likened it to fingerprints citing Davis which found that there does not involve the probing intrusion into one's face. The Cupp v. Maryland case out of the Supreme Court, they referred to fingerprints as merely physical characteristics exposed to the public. Counsel, the district court in this case held that fingerprinting is a physical trespass on an individual for the purpose of collecting information. What would your best, either Supreme Court or Fifth Circuit case or both, preferably, your best case that defines for the purposes of obtaining information in the civil context? So I thought about that, Your Honor, because when Jones came out, Jones did not address the reasonableness component of that case. In fact, they found that the government forfeited. But they did go back under the Trespassory and said, you need two factors. You just mentioned one of them. The second factor is you have to be able to obtain information. I would argue that if the Supreme Court were to look at a factual case involving a workplace intrusion, as such in Ortega, versus what actually they looked at in Jones which came up under a criminal violation for GPS tracking, I would articulate that the justices would look at that case very differently because there has already been standards set out that workplace intrusions are different. There is a diminished expectation of privacy when you're not dealing with criminal conduct. So in Jones, because it was a criminal case, the courts have found that in there the rights of an individual are higher. So there is a diminished expectation of privacy when you're dealing with workplace intrusions. And in fact, while my opposing counsel mentioned we need a special need, we need a special need, no, the special need is just another way for the suspicionless search. It's not a special need. The standard that this court should look at, which is the same standard the district court looked at, is reasonableness. Whether you use the CATS Expectational Society privacy concerns or you use Jones' trespassory analysis or you use Ortega's special needs, they all fundamentally get to the same question. The question is, do you weigh the privacy interest of the individual versus the government's interest? And that's exactly what the court did in this case. They looked at what is the interest of the individual on the expectation of privacy. And in there, the court looked at the scope. And they used the cases of the Supreme Court to make the opinion that it does not protect it because it is de minimis. It is minimal. And you have Supreme Court precedents to articulate that it is minimal. The Eleventh Circuit has also found that there is no search when it comes to photographs and fingerprintings. So the vast majority of cases, and I will agree, it's limited. And we do know the Supreme Court has not spoken directly on point to this. Scalia says that in the Maryland v. King case. But all of the cases that have looked at fingerprints touch on exactly what Judge Englehart said. Well, wait a minute. These types of technologies are being used all the time. The Parish of Jefferson uses the Kronos fingerprint system parish-wide for all employees, including through the judiciary, which Judge Greffer found in the temporary restraining order they filed against our client that his own staff members use this. And to address Chief Elrod's concerns regarding the Kronos equipment, we did ask the underlying court to take judicial notice of that 24th Judicial District case, which this court could exercise as well. And it is contained in the record documents under 95-96. Same plaintiffs, same defendants, same allegations that we violated their constitutional rights, both under state and under federal law. And in that case, the plaintiff, Mr. Venegas, attached in his petition the justification, which is the second court got us to reasonableness. What was the justification at its inception? And in that pleading, attached to it, it says that we are doing timekeeping and payroll processes to ensure consistency among employees. So does the Kronos system require the use of fingerprints? Or would it also work with cards? So the system itself will work with several different modalities, including pins, including cards, including fingerprints. It was the parish's prerogative, through the council, through its appointing authority, and down to the fire chief, to implement the fingerprint component of that. And I do think it's important to note, which is also attached, which you can take judicial notice, we did enter into an exhibit in the 24th Judicial matter, an affidavit from Jeb Tate, who is the information technology, the highest level of the parish security, and in there he explains some of the concerns that have been addressed here. What it does is it takes your fingerprint and you put it on and it converts it to a unique mathematical formula. That fingerprint that you place is no longer stored either on the parish's system or in the Kronos system. Only the new mathematical, unique formula that cannot be used to duplicate a fingerprint is otherwise stored. What about for those who won't give a fingerprint? I'm sorry? What about for those who won't give a fingerprint? There's a portion of our society who can't give a fingerprint. You know that. So what is the alternative measure? So the alternative measure for those specific circumstances would be that they would be authorized to potentially use cards. But as Judge Guidry had indicated, I'd like to point out that the burden here for us in controverting this and in supporting the affirmation of the district court is not to prove that we have to find the most reasonable. It is simply that looking at this, is it reasonable? We have a justification that supports an interest by the government that has been established in Wyman v. James, a Supreme Court case, which indicated that protecting the public fisc in ensuring the accountability is a legitimate government interest. Can I ask a few more questions about the card?  Okay. So some people might use cards under the current system. Are there cards being used under the current system or not? So my understanding is that we currently are not implementing the system as a result of this litigation. So there are no cards. So it's nothing. It's not happened yet. It was sought to be implemented, but as a result of the pending litigation, including a temporary restraining order that was denied. Did the fire chief exempt himself and a bunch of other people? Under a legitimate categorization that they are exempt from overtime requirements, and so therefore they are not required to utilize a clock in and clock out system. So anyone who is not under overtime law doesn't have to do this? That's correct. So which is again a legitimate thing. So for example, you know, your staff. And why are the judges doing it? The judge's staff were doing it, Your Honor. Oh, okay. So the judges are not doing it either. Only the judge's staff who might be. Right. But I would submit, Your Honor. They're eligible for overtime? I'm sorry? The judge's staff? The judge's staff uses the chronos. The entire system. They're eligible for overtime is my question. I was just, I didn't, that may be under that law. Yeah, and I don't believe, you know, who utilizes this system versus others is dispositive of determination as to whether it's reasonable or not. The exemption status happens to be the justification for why individuals are not required to use the time clock at all. Have there been any, because it hasn't been implemented, there may not have been, have there been religious objections and have they been honored? So we had one individual who claimed that placing his hand would be a mark of the beast in one of the litigants in the temporary restraining order. Was that honored? That was, the entire system was not utilized thereafter, so he was not required to utilize it. But is there some sort of opt-out for religious built into this? It would be looked at on a case-by-case basis. I am not clear that there's a particular protocol, but that issue would be brought up to the parish attorney's office to evaluate that particular concern. Would you be arguing the same argument if it was about DNA and you had to spit into a cup or give your hair every time you... I think they can provide some persuasive authority, and if you look at DNA, DNA... What's the answer? I would be arguing that it can provide some persuasive authority for this court to analyze the reasonableness of the actions. So DNA specifically was addressed in Maryland v. King, where the court found that taking a buckle swab of the inside of the mouth was not considered an unreasonable search under the Fourth Amendment. So you would argue that as government, as an employer, could swab everybody or take their hair every day? Not every day, Your Honor. I think that that would go to the police. Reporting to office. How is that? You can make them put their finger, but you can't make them spit or swab them? Because, Your Honor, you have to look at the context. So the law requires looking at the totality of the circumstances. I'm trying to figure out what's the principled basis between a swab and a...put your finger. So the finger is ubiquitous. It's everywhere. As Judge Englehart had noted, it's on glasses, it's on cups, and it's been put out there into the public domain. The internal, the cases that have looked at DNA, have all looked at it from the terms of the criminal context and whether or not there was probable cause in order to be able to take that. But I would submit that the Maryland v. King case, which was a 5-4 decision with Scalia having read that opinion into the court, which was a very rare occasion for him to do so, they specifically held that the use of a buckle swab did not constitute an unreasonable search. So I do think that because we have the Supreme Court and multiple court cases thereafter citing to it, finding the de minimis nature of the intrusion, it is relevant because there may be other intrusions, blood, urine, but even those in the context, Your Honor, the Skinner case. You're not giving very much... This is rather stunning because I thought you would say, oh, Your Honor, this is not that. This is so minimal compared to that. But what I think I hear you saying is, oh, it'd be fine to take their hair, it'd be fine to take their swab, it would be fine because these other cases do it within the criminal system. And so we could do any of these things and we haven't even gotten to blood or urine or other bodily functions. Is that your position? Because those are allowed in the criminal context? Well, not even, Your Honor... That would be fine? So I don't feel that you have any line that would give us comfort, which I thought you were going to say, oh, well, it's ubiquitous, the fingerprint, and it's very different than having to give your urine... Well, Your Honor, and the reason why there's hesitancy there is because the Ortega decision, which looked at workplace intrusions, which was then followed by the Supreme Court, found those very things that you're referring to, those suspicionless use of blood, of urine, in the work context place, is allowed and authorized and not unreasonable. So the Skinner decision... But it's only in, like, special security jobs or things like that, where there's certain concerns, isn't it? It's... Well, not necessarily. You have the Veronia decision out of the Supreme Court, which involved public athletes and whether or not you could drug test public athletes, which was not a security decision. You also had the suspicionless drug testing of railroad employees... Are we concerned that the firefighters are having some kind of high-performance abilities that make them better than other firefighters? I mean, that's not... Not at all, Your Honor. It's simply utilized for record-keeping and time-keeping purposes to ensure... I was... That was a rather facetious question. I'm trying to... That's very different of whether the athletics have an advantage in the sport, like the Olympians or something. Yeah. I guess, Your Honor, I'm giving you examples of where the Supreme Court, in workplace intrusion cases, have specifically found that the very nature of the things that you're articulating in regards to the more invasive procedures are still authorized under the reasonableness compotion. So, I'm submitting to you today that we're not in that realm. The facts that are before this case, in terms of what this district court had analyzed, in Judge Vitter's opinion, was, is the use of a fingerprint, is that scope an intrusion for which exceeds the bounds of what would be protected under the Fourth Amendment? And she found that, simply, it does not, looking at... So, where is your line? Where is your slippery slope here? Where's your bulwark against the slippery slope? Well, Your Honor, candidly... You don't have one. Because it's a hypothetical question, Your Honor. I think it depends on the nature of the justification for the use. So, Judge Englehart brought a couple of them that I could substantiate. Utilizing a fingerprint for the use of a background check, that's a legitimate use. I walked into your courthouse today. I was subject to a suspicionless search in order to keep the judiciary and the members of this public safe. Those are examples where the court has found, in the employer context, a diminished right under privacy. And what I'm submitting to you, Your Honor, is that the facts that are before this case are not hypothetical. They are, is a fingerprint used for the purposes of a time clock? Is that a legitimate government interest? That's not an employer context, by the way. I'm sorry? I'm sorry. Your example was not an employment context. Well, Your Honor, I would submit that the use, and Judge Englehart brought it up, of use of background checks for fingerprints can be likened to it. I mean, the courts have been clear that it is a minimal intrusion. Okay, so where is your line? I'm sorry, you're telling me this is minimal. Where is the line? Is you're in a line? No. For the purposes of timekeeping?  Would you do blood for timekeeping? I, Your Honor, that's not a fact that's before the case, and what I would submit to you is that... Give us some comfort. The Jefferson Parish, in its infinite wisdom, has not opted to utilize blood for the purposes of timekeeping. Courts have allowed blood use for suspicionless... This is not that nature of it. They're asking for a de minimis use of a fingerprint, which is utilized all the time in order for timekeeping purposes. If you're asking me whether or not I think that the government can utilize urine for the purposes of timekeeping, that would have to be analyzed under what is the justification. Why is urine going to be utilized? And they would look at the burden associated with that. I would not recommend, at this juncture, with the state of technology, that using urine or blood would be efficient in order to be able to be used as a clock-in and clock-out method. I think that the hypothetical, in terms of that, wouldn't come to fruition. What about DNA? DNA was also looked at, Your Honor, in several of the cases, and DNA is utilized. The Supreme Court looked at DNA and found that it can be likened to fingerprints for the purposes of identity. DNA can be utilized, depending on the nature of the case. Would you recommend that DNA be used by the government for timekeeping purposes? Your Honor, it's not the facts before this case, and I would have to see the legitimate interest in why the use of DNA may favor. As technology changes, we know that courts before used, I think Judge Enkelhardt issued an opinion on geofencing in 2024. I looked at that case, and he found that just because you have a technology change doesn't change the underlying pinnings of what the Fourth Amendment would find. This particular case, though, is different from the home cases because the courts have found that the use of the fingerprint is not of the nature that would involve a significant intrusion that would justify a protection under the Fourth Amendment. For those reasons, Your Honor, we think that the District Court looked at the cases that are available, looked at the legitimate interest of the government in ensuring timekeeping records, and the de minimis expectation of privacy in concluding that the Fourth Amendment, under the Ortega decisions of the workplace intrusion, it's simply a special need has been met, and we don't find that we violated the Fourth Amendment and we would respect it. You're saying a special need has been met. A special need has been met because it's—I thought you said you didn't need a special need. A special need, Your Honor, is the nomenclature utilized by the court for a suspicionless search. We know that we do—I do not have the burden to establish reasonable, sufficient, or probable cause in order to take the fingerprint in this case because we're in a workplace environment. So, the special needs is the standard, but that standard, whether you're in—whether you're in Katz, whether you're in Jones, or whether you're under Ortega, all get you to the same place. Is it reasonable? Is timekeeping a legitimate government concern that outweighs the privacy interest for what the Supreme Court and a progeny of cases have determined is minimal? And for those reasons, we think that district court was justified. And you believe that you don't take into consideration the fact that there are other very easy methods for doing timekeeping? We do not, Your Honor. Including ones in your own product. Yeah, because, Your Honor, I do not believe and with all due respect that it would be the judiciary's prerogative— You know what they say when you say with all due respect. Go ahead. Well, Your Honor, I think what you're asking is whether or not I would place you in a position to have to determine the most reasonable form that an employer can utilize. He's asked for injunctive relief here. The only thing that is before this judiciary is fingerprinting. So reasonableness does not include other alternatives? Not in terms of an evaluation. It is a reasonable. In this context? No. It is this reasonable. Not are there other less— Intrusive means would be equally available and less and more reasonable. Correct, because then this court would be asking the employers to create policy through the bench, and I don't believe that would be. Thank you, Your Honors. I appreciate your time. Thank you. You've saved time for rebuttal. Thank you, Your Honor. I just wanted to point out in rebuttal— One second. Go ahead. Yeah, that was him. I'm talking about Mr. Venegas' saved time for rebuttal. No, I didn't mean Mr. Watson had saved time. Mr. Watson is done. I thought we were going to hear from Mr. Watson again. We appreciate Mr. Watson. We're not hearing from you again, though, today. We may need additional time on that. But right now, we're hearing from Mr. Venegas and he gets to start over at 5 again. No problem. Thank you, Your Honor. I just wanted to point out that one of the concerns when we filed the original suit was there's no protocols. Basically, these guys were lined up, not trying to make it be overly dramatic, but they were lined up and said, give us your fingerprints. Well, one of the concerns with— Firefighters are a group, and one of the concerns is that there was no protocols on things perhaps opt-out, religious objections, and so forth. That was one concern that we had. I believe initially they were asked to submit prints, but then later they were told. Yes, Your Honor. At what point was—at neither point was there a protocol or— Sorry, can you repeat that? You're saying that they were treated the same at both points when they were just asked to do it as opposed to when they were told to do it? Originally, they were asked, and then the firefighters started resisting, and then an order went out that ordered them to do it. And of course, as firefighters or any paramilitary organization, you have to follow the orders or suffer the disciplinary consequences. The other thing is that we had some concerns about who was exempting themselves. These are things that should be developed on the record, because it wasn't just the fire chief. It was certain people that were collecting overtime, but that's not in the record, so that was one of the reasons why we wanted to find out. Aren't they in a union that their union rep can take care of all these things? Well, ultimately, the union is the one that ultimately drives these lawsuits. Right, so they can work it out with them that we're not going to do this unless you give an opt-out for religion, and we're not going to do this unless you let them know that— It doesn't work like that with the Parish of Jefferson. What now? It doesn't work like that with the Parish of Jefferson. They order you to do it, and there's really no negotiation. Could an employee be disciplined for failure to do this and fired? Yes, Your Honor, and that's the point. That's the point with consent. We didn't give our consent. We were forced to do it. Is the question from Judge Guidry that they acted like it was going to be voluntary or something, but now it's been ordered, and disobedience would be a reason to be terminated, wouldn't it? Yes, Your Honor. So originally, it wasn't so much of an act. It was show up at the headquarters and we're taking your fingerprints, and then when people resisted, that's when it became an order. Counsel, let me ask you one of the last things you said in response to my question when you were at the podium on your main argument about exchanging a constitutional right for public employment. Aren't public employees— some public employees—aren't they prohibited from exercising certain First Amendment rights? People that work in courthouses, people that work for the sheriff's office. You're right. This is a civil service system. So basically, you're supposed to— you can't engage in certain political activity, although I will say this has been loosened up quite a bit. I think it's something related to the—they call it the hatch, but I could be wrong there. So to some extent, some political activity, that's part of the exchange there, but we don't have a history on giving up your fingerprints for that. Now, you said that it would— in answer to another question that Judge Inglehart had, that you were only speaking for public employees because the private could give away this. But, you know, we have that Sembrano case that says you can't do the job for the jab. You can't do the job for the jab. The COVID vaccine was the way that they phrased it, the job for the jab. And that we said that in that context that they were entitled to some sort of injunctive relief. It wasn't just at the end of Title VII where we dealt with whether damages, it was whether imminently you could be required to get a COVID vaccine. And what was the whole thing? I'm sorry, I didn't do— You can't do—the company couldn't do that. And I would say analogously it would be similar in this regard. Okay. Something Mr. Watson said and I don't know if I'm going to remember it, but you know what? I submit my time. Thank you all. I appreciate it. Thank you. We have your arguments. Very interesting case. Thank you all. Appreciate it. That concludes the arguments for today. The court will stand in recess until tomorrow morning at 9 a.m. Thank you. Thank you.